**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| |
|---|
| Matthew Downing,<br>Individually and on Behalf of All<br>Other Persons Similarly Situated,<br><br>     *Plaintiff,*<br><br>v.<br><br>Keurig Green Mountain, Inc.,<br><br>     *Defendant* |

C.A. No. _____

## COMPLAINT

Plaintiff, Matthew Downing, alleges for his complaint against defendant Keurig Green Mountain, Inc. ("Keurig") as follows:

### Preliminary Statement

1. Plaintiff brings this action on behalf of himself and all other similarly situated consumers to obtain monetary, injunctive, and other appropriate relief for himself and members of the Classes (defined below) as a result of the false and deceptive acts of the defendant Keurig, as detailed herein.

2. Defendant Keurig manufactures and distributes coffee products, including single-serve plastic coffee pods ("Pods"), which are made for Keurig coffee brewing machines that Keurig also manufactures.

3. After introducing Keurig coffee machines for commercial use in 1998 and later for home use in 2004, the Keurig Pods grew rapidly in popularity. The popularity was in part due to the convenience of the single-serve aspect of the Pods. That popularity enabled Keurig to charge

more for the Pods than it would cost consumers to obtain their coffee from other methods, such as traditional drip mutli-cup brewing machines.

4.      However, along with the Pods' popularity came substantial backlash from consumers due to the significant negative environmental impact of the many millions of disposable Pods, all of which ended up in landfills. In response to this backlash, Keurig attempted to rebrand itself as an environmentally friendly company. A core component of Keurig's revamped corporate image was to make, market, and sell Pods that Keurig represented were "recyclable."

5.      In June 2016, Keurig began manufacturing and selling purportedly recyclable Pods. Keurig prominently displayed on the Pods' product packaging that consumers could "Peel · Empty · Recycle," and the labels told consumers: "Have your cup and recycle it, too." The labels included the well-known triangular recycling symbol, further underscoring that the Pods were recyclable. The product labels communicated and continue to communicate unambiguously to consumers that the Pods were recyclable.

6.      Keurig's representations on the product labels that the Pods were recyclable are false and deceptive. In fact, the Pods are not recyclable in most communities primarily because the small size of the Pods makes it uneconomical for recycling facilities to properly sort the Pods from other items placed recycling bins. This key impediment to the recyclability of the Pods is exacerbated by other characteristics of Pods that also make them difficult and uneconomic to recycle. These characteristics include the tendency for the Pods to be crushed or mangled before they can be recycled, the fact that the metal foil attached to the plastic Pods must be separated from the Pod to recycle the plastic, and contamination of the Pods from coffee grounds.

7.      Keurig's misrepresentations concerning the recyclability of the Pods were highly significant and material to consumers, and as a result of Keurig's misrepresentations, consumers

purchased and received products (Pods that were not recyclable) that were much less valuable than the products Keurig had promised (truly recyclable Pods).

8.      Plaintiff Matthew Downing purchased Keurig Pods in 2017, specifically in reliance upon Keurig's representations on product labeling that the Pods were recyclable. Thereafter, Mr. Downing learned that the Pods were not recyclable and he stopped buying the Pods. Plaintiff brings this action pursuant to M.G.L. c. 93A §§ 2, 9 ("Chapter 93A") on his own behalf and on behalf of other purchasers of Pods that Keurig falsely marketed as being recyclable. The definition of two proposed classes—a nationwide class and, in the alternative, a Massachusetts class—are set forth below.

## Parties

9.      Plaintiff Matthew Downing is a resident of Marlborough, Massachusetts. In or around 2017, Mr. Downing purchased Pods that were falsely labeled as recyclable based on the labels indicating that the Pods were, in fact, recyclable.

10.     Defendant Keurig Green Mountain, Inc. is a Delaware corporation with its principle place of business in Burlington, Massachusetts.

## Jurisdiction and Venue

11.     This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(d). This is a class action brought on behalf of more than 100 class members; the claims of the Plaintiff and the Classes exceed $5 million; and there is minimal diversity between the Class members and Keurig because there are members of the Classes who are citizens of states of which the Defendant Keurig is not a citizen.

12.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the conduct complained of herein occurred in this District.

## Factual Allegations

### The Rapid Growth of Keurig Machines and Pods

13.     Keurig manufactures and sells, among other products, single-serve Pods that work with Keurig's own single-serve Keurig coffee brewing system.

14.     The Pods are designed to brew a single cup of coffee, tea, hot chocolate, or other hot beverage. The grounds or other ingredients for the beverage are stored in a single-serve coffee container, which Keurig calls a "K-Cup" (referred to in this complaint as a "Pod"). A Pod consists of a plastic cup, aluminum lid, and filter, and each Pod is filled with coffee grounds, tea leaves, or other contents, which then create a hot single-serve beverage when water is passed through the Pod in the Keurig machine.

15.     Keurig began selling Keurig brewing systems in 1998, targeting primarily the in-office brewing market. In 2002 alone, Keurig sold more than 10,000 commercial Keurig machines.

16.     The popularity of Keurig machines in offices led Keurig to develop a home-use version of the Keurig machine. Keurig launched home-use Keurig machines in 2004. After launch, Keurig machines rapidly became the dominant brand of home brewing machines and single-serve Pods.

### The Backlash Concerning Pods' Environmental Impact

17.     Originally, Keurig's Pods were made from #7 plastic, which was not recyclable in most locales regardless of any of the other attributes of the product (for example, size or contamination).

18.     After Keurig machines and Pods exploded in popularity, Keurig came under increasing criticism for the volume of plastic trash generated by Pods.

19.     A 2010 New York Times article contrasted the corporate image presented by Keurig, reflected in its motto of "Brewing a Better World," with the impact of its "nonrecyclable,

nonbiodegradable, single-use coffee pods." By the time of the article, Keurig anticipated selling nearly three billion Pods annually, which were designed to be thrown away after the serving of coffee was brewed. The article cited to a senior resource specialist for the Natural Resources Defense Council, who described Pods as "counter to environmental progress."

20.     Around this time, other competing single-cup coffee brands began selling single-serve cups that claimed to be recyclable, reusable, compostable, or biodegradable. In light of the increasing consumer preference for (what the consumers were told were) recyclable Pods, this competition threatened Keurig's dominance in the single-serve coffee market. It also was damaging to Keurig's corporate image that its Pods were not recyclable.

21.     Keurig also faced mounting pressure from its own consumers to address the substantial negative environmental impact of its Pods.

22.     The pressure Keurig faced from consumers is consistent with the concern consumers have more generally for the environment, which has steadily increased in recent decades. Pro-environment attitudes have become increasingly socially important, with as many as 90% of consumers saying that environmental concerns are highly significant to them. These environmental concerns drive consumer behavior, as consumers seek and attach greater value to products that are environmentally friendly. The recyclability of a product and its packaging is the most significant environmental attribute of a product upon which consumers focus and to which consumers attach value.

***Keurig's Strategy to Revamp Its Corporate Image: Purportedly Recyclable Pods***

23.     In response to criticism from the press, environmental groups, and consumers, Keurig sought to revamp its corporate image to make it appear that it had become an environmentally friendly company.

24.     Keurig announced this shift in strategy through what it called its 2013 Sustainability Report (the "Sustainability Report"). In the Sustainability Report, Keurig presented a plan to become a "socially responsible, premium coffee roaster." It presented three core components to its new image: "Resilient Supply Chain," "Sustainable Products," and "Thriving People & Communities."

25.     The Sustainability Report specified what Keurig meant by "Sustainable Products." The most significant aspect of this component of Keurig's new socially responsible image was that "100% of K-Cup packs will be recyclable."

26.     In the Sustainability Report, Keurig's chief executive officer, Brian P. Kelley, admitted that "[t]he lack of recycling options for used K-Cup packs stands out front and center" among the "areas in which [Keurig] can do better." Keurig explained in particular that "[t]his is an area where our customers and consumers have been asking for greater progress," recognizing the importance of recyclability to consumers. In response to this acknowledged consumer demand, Keurig "pledged that, by 2020, 100% of K-Cup packs will be recyclable."

***Keurig Begins Selling Purportedly Recyclable Pods***

27.     Keurig began selling purportedly recyclable Pods in June 2016. The labeling of such Pods has been substantially the same across all such Pods sold by Keurig.

28.     Unless otherwise specified, all references to "Pods" in this Complaint refer to the purportedly recyclable Pods that Keurig began selling in June 2016 and continues to sell as of the filing of this Complaint.

29.     One side of the box containing the Pods contains a prominent logo that represents that the Pods are recyclable. A typical example of that label is:



30.     As reflected in that example, the label on the Pod includes both the word "Recycle," as well as the "chasing arrow" symbol—a triangle made from three arrows that communicates to consumers that the Pod is recyclable.

31.     Another side of the boxes of Pods features phrases such as "Have your cup and recycle it, too," followed by a graphic depicting three steps to recycle a Pod. A typical example of such a label is:



32.     Again, this part of the product label represents that the Pods are recyclable by graphically showing the process to "recycle" the Pod; by twice using the word "recycle"; and by including the same triangle chasing arrow recycling symbol that consumers understand to mean a product is recyclable.

33.     Although there has been some variation among the labels of the purportedly recyclable Pods over time, the products each share common label design characteristics, including the prominent use of the words "Recyclable" or "Recycle" on the front label, along with a prominent chasing arrow symbol that consumers understand to mean that a product is recyclable. The claims on the labels regarding the recyclability of the Pods are substantially similar across the purportedly recyclable Pods from June 2016 through the present.

34.     A reasonable consumer viewing these labels would understand that the Pods were recyclable; that is, if the consumer placed the Pod in the consumer's recycling bin, the plastic from the Pod would be processed and reused to make new plastic products, rather than ending up in a landfill.

35.     A reasonable consumer would understand from the Pods' labels that the Pods themselves are, in fact, recyclable, not just that the Pods are made from a type of plastic that is potentially recyclable. It would be meaningless to a consumer who desired to purchase a "recyclable" product that the product is made with recyclable material but, nevertheless, cannot actually be recycled.

36.     Although some Pod labels contain statements such as "Check Locally," such statements do not mitigate or cure the direct misrepresentation to consumers that the Pods are recyclable. The phrase "Check Locally" does not communicate that the Pods are not recyclable in most communities, nor does it indicate with whom a consumer should "check" or what they should ask. A reasonable consumer viewing the entire Pod label would still reasonably understand that the Pod is recyclable in his or her community. The Federal Trade Commission, in fact, conducted a survey that determined that there is no statistical difference between a consumer's perception of an unqualified claim that a product is recyclable, and a claim that the product is recyclable but that the consumer should check locally. 63 FR 24240, 24244 (1998) (describing survey; "[t]here was

no statistically significant difference" in consumers' understanding of the meaning of an "unqualified 'recyclable' claim" versus a recycling claim accompanied by direction to check locally). That is, the phrase "check locally" does not cure Keurig's false and deceptive representations on the labels of Pods that the Pods are recyclable.

***The Purportedly Recyclable Pods Are Not Recyclable.***

37.     The Pods are not recyclable in most communities for multiple reasons. *First and most significantly*, the Pods are too small to be recycled in most communities. In order for a product to be recyclable it must, of course, be made of recyclable material. But that is not enough. The product must also be able to be economically sorted out of the stream of numerous materials collected for recycling by residences and businesses. Items that are too small in size to be economically sorted cannot be recycled. Keurig's Pods are too small for most recycling facilities to separate them from other items collected for recycling. The result is that the vast majority of the purportedly recyclable Pods that Keurig's customers put in their recycling bins are not in fact recycled into new plastic products. Instead, contrary to the wishes and understanding of Keurig's consumers, the used Pods end up in landfills.

38.     *Second*, the Pods, due to their small size compared to other items collected for recycling, are particularly susceptible to being crushed, compacted, or mangled before they arrive at the stage within a recycling facility in which the Pods would be sorted out from other items. This makes it even more difficult and uneconomic for the Pods to be sorted from other items. Again, the result is that the vast majority of the purportedly recyclable Pods that Keurig's customers put in their recycling bins are not in fact recycled into new plastic products. Instead, contrary to the wishes and understanding of Keurig's consumers, the used Pods end up in landfills.

39.     *Third*, the plastic portion of the Pods comes with a connected foil lid, which keeps the product fresh before the consumer uses the Pod. Even at the few recycling facilities that can

accommodate the small size of the Pods, in order for the plastic in the Pods to be recycled, the foil lid would have to have been removed by the consumer. The foil lid, however, is difficult to remove. Consumers attempting to remove the foil lid often only partially remove the foil, leaving behind a piece of foil attached to the Pod that may render the Pod non-recyclable. Recycling facilities generally lack the ability to economically separate out attached components of a product made from different materials that are physically attached to each other. For this reason, many Pods that arrive at the few recycling facilities that can accommodate the small size of the Pods are still not recycled because foil remains attached to Pods. Again, the result is that the vast majority of the purportedly recyclable Pods that Keurig's customers put in their recycling bins are not in fact recycled into new plastic products. Instead, contrary to the wishes and understanding of Keurig's consumers, the used Pods end up in landfills.

40.     *Fourth*, the Pods often arrive at recycling centers contaminated with food waste—specifically, the coffee grounds or other ingredients that remain in the Pod after the consumer uses it. Efforts to remove coffee grounds often fail to remove all of the grounds because even after a customer cleans the Pod, a paper filter remains in the Pod to which grounds or other beverage ingredients stick. Significantly, Keurig falsely represents to consumers on its label that in preparing the Pod to be recyclable, the "Filter can remain." *See* label image below paragraph 31. Otherwise recyclable products that contain food waste often cannot be recycled because if the food waste is not separated from the recyclable material during the recycling process, the contaminant would undermine the quality of the recycled material. And it is not economical for a recycling facility to clean the small Pods in order to recycle them. This is another reason why that even with respect to Pods that arrive at the few recycling facilities that can accommodate the small size of the Pods, the Pods are still not recycled. Again, the result is that the vast majority of the purportedly recyclable Pods that Keurig's customers put in their recycling bins are not in fact recycled into new plastic

products. Instead, contrary to the wishes and understanding of Keurig's consumers, the used Pods end up in landfills.

41.     In addition to the features of the Pods themselves that render them non-recyclable, changes in the market for recyclable products have made it likely that none of the plastic in any of Keurig's Pods is actually recycled. Specifically, for many years, the largest destination for recyclable material was China; cargo ships would come to the United States with new products manufactured in China and then return to China full of recyclable products. In 2013, however, China implemented "Operation Green Fence," which had the purpose and effect of reducing the amount of contaminated recyclable products that were being sent to China. Then, in 2017, China announced a further "National Sword" policy that placed strict limits on which recyclable materials could be sent to China for further processing and also the degree to which such materials could be contaminated. These measures substantially reduced the end-market for the plastic in the few Pods that could have otherwise been recycled, making it likely that none of the plastic in the Pods was actually recycled and likely that all of the plastic in the Pods ended up in landfills.

***Keurig's Statements and Representations on Its Labels on Its Pods Are False and Deceptive.***

42.     Keurig's statements and representations on the Pods' labels that the Pods are recyclable are false and deceptive because the Pods are not, in fact, recyclable in the vast majority of communities in the United States. It is deceptive for Keurig to label its Pods as recyclable when, in fact, they are not recyclable.

43.     Consumers understand claims that a product is recyclable to mean not only that the product is manufactured with recyclable material, or that the product may be theoretically recyclable somewhere, but that the product will, if placed in a recycling bin, likely be recycled—meaning that the materials used for the product will actually be reused to make new products. Of course, a product that passes through a recycling facility but that ultimately ends up in a landfill is

11

not "recycled," and products that are likely to end up in a landfill despite consumers placing the products in recycling bins cannot be honestly or accurately labeled as "recyclable."

44.     Consumers who want and prefer to purchase and use products that are recyclable do so not because they simply want a product that is manufactured with recyclable material, or that the product may be theoretically recyclable. Rather, they want a product that contains materials that will actually be recycled and will actually be reused to make new products and not end up in a landfill.

45.     The Federal Trade Commission regulates when companies can represent that their products are "recyclable" and when such representations are deceptive under, and in violation of, Section 5 of the FTC Act, 15 U.S.C. § 45. Those regulations are codified at 16 C.F.R. § 260 and they are known as and referred to herein as the "Green Guides." The Green Guides provide that a claim that a product is "recyclable" is deceptive if the product is "ordinarily…not separated from other trash…for recycling." 16 C.F.R. § 260.3(c) & example 2. The fact that an item is "technically capable of being recycled" does not matter if the product is "ordinarily…not separated from other trash at the landfill or incinerator for recycling." In that circumstance, the recyclable claim is deceptive "since it asserts an environmental benefit where no meaningful benefit exists." *Id.*

46.     More specifically, the Green Guides also provide: "It is deceptive to misrepresent, directly or by implication, that a product or package is recyclable. A product or package should not be marketed as recyclable unless it can be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item." 16 C.F.R. § 260.12(a).

47.     The Green Guides dictate that a representation that a product is recyclable is deceptive unless recycling facilities to recycle the product "are available to a substantial majority of consumers or communities where the item is sold." 16 C.F.R. § 260.12(b)(1). The Green Guides

provide that "substantial majority," in this context, means that at least 60 percent of consumers are able to recycle the product in their community. *Id.* Hence, a claim that a product is "recyclable" is deceptive to **all** consumers even if some consumers (less than 60%) could successfully recycle the product. Whether the claim is deceptive, that is, does not turn on whether the facilities in a particular consumer's community recycle the Pods or whether a particular consumer's Pod is actually recycled. Instead, the deceptive nature of the statements depends upon whether the Pods are recycled in a substantial majority of communities.

48.     The FTC's determination that "recyclable" claims are deceptive whether or not a particular consumer's product is successfully recycled is consistent with a significant reason why environmentally conscious consumers purchased recyclable products. They purchase such products not only so that they can personally recycle the products but also to reward and incentivize companies that make products that reduce harm to the environment.

49.     Furthermore, under the Green Guides, the fact that a product contains recyclable material is not sufficient to justify a claim that the product is recyclable. In a provision particularly applicable to the Keurig Pods, the Green Guides provide that:

> *If any component significantly limits the ability to recycle the item, any recyclable claim would be deceptive. An item that is made from recyclable material, but, because of its shape, size, or some other attribute, is not accepted in recycling programs, should not be marketed as recyclable.*

16 C.F.R. § 160.12(d) (emphasis added).

50.     The FTC's interpretations of the FTC Act, including those set forth in the Green Guides, are instructive and controlling and hence establish that Keurig's labels on its Pods are deceptive in violation of Chapter 93A, §2. *See* M.G.L. c. 93A § 2(b) ("It is the intent of the legislature that in construing [the meaning of "deceptive acts or practices"]…courts will be guided

by the interpretations given by the Federal Trade Commission …to section 5(a)(1) of the Federal

Trade Commission Act….").

**Keurig Has and Continues to Knowingly and Intentionally Engage in Deceptive Conduct in Violation of Chapter 93A § 2.**

51.     Keurig has sold, and continues to sell, the Pods with the false and deceptive product

labels described herein, knowing full well that the representations on the Pods' labels that the Pods

were recyclable were false and deceptive.

52.     Keurig's launch of the purportedly recyclable Pods occurred only after its own,

substantial internal analysis about the recyclability of the Pods, and Keurig tracked the degree to

which the Pods were recycled after launching the purportedly recyclable Pods.

53.     Keurig performed its own internal tests that concluded that in even in facilities that

accepted the Pods for recycling, only 30% of the Pods were successfully recovered. And, as Keurig

knew, even that low figure does not reflect the true rate of recyclability of the Pods because, among

other reasons (i) many facilities do not accept Pods for recycling at all; (ii) Keurig's tests were not

based on a representative sample of recycling facilities; (iii) Keurig's tests were not performed in

real-world conditions but instead in conditions that artificially drove up the success rate; (iv)

Keurig's analysis focused only on Pods that made it to a particular stage of the recycling process

known as the "container line" and did not account for Pods that were screened out as garbage

before that stage; and (v) Keurig's analysis did not account for whether there was an end-market

for the plastic from the Pods that would result in the plastic in the Pods actually being recycled.

54.     During all relevant times, Keurig was fully aware of and knowledgeable of the

FTC's Green Guides, or was willfully ignorant of them.

55.    Accordingly, Keurig has known since it began representing on the Pod labels that the Pods were recyclable, in 2016, and to this day, that those representations were deceptive under the Green Guides.

56.    Accordingly, Keurig willfully and knowingly violated and continues to willfully and knowingly violate the Green Guides; Section 5 of the FTC Act, 15 U.S.C. § 45; and Ch. 93A, § 2.

**The Wrongful Conduct Alleged in the Complaint Occurred in Massachusetts.**

57.    The conduct giving rise to Plaintiff's claims—Keurig's deceptive campaign to falsely market and label its Pods as recyclable, was orchestrated in and emanated from the Commonwealth of Massachusetts. Massachusetts has a significant interest, as codified by the Massachusetts legislature in Chapter 93A, in regulating, punishing and preventing such wrongful conduct occurring within the Commonwealth.

58.    Keurig developed its corporate strategy of marketing purportedly recyclable Pods in Massachusetts, primarily from its Burlington, Massachusetts headquarters. Keurig designed the Pod labels at issue in this case in Massachusetts, and made the representations detailed in this complaint and disseminated them from its headquarters in Burlington, Massachusetts. The deceptive conducted alleged in the complaint substantially emanated from Massachusetts.

59.    Keurig's product design staff for the Pods is based in Massachusetts. Keurig's "Environmental Sustainability Engineers," who appear to have been responsible for engineering the purportedly recyclable Pods, are based in Burlington, Massachusetts. For example, one such Environmental Sustainability Engineer, Ali Brlandina, indicates on her LinkedIn profile that she led all "MRF [materials recovery facility] testing across North America" for Keurig, including analysis of "how items flow through [a municipal recycling facility], evaluat[ing] how successfully

they are sorted, and ultimately captured for further processing of recycling material." According to her LinkedIn profile, she performed these functions for Keurig in Burlington, Massachusetts.

60.     Along the same lines, Keurig's Director of Engineering and Technical Director, Jim Shepard, who was responsible for the "overall industrial design, technical development, and manufacturing execution of brewer systems and carafe pod systems" for Keurig, likewise performed these functions in Burlington, Massachusetts, according to his LinkedIn profile.

61.     Keurig's senior marketing staff are also based in Massachusetts. For example, Brenda Armstead, Keurig's current Vice President of Brand Marketing for coffee, and its former Vice President of Consumer Insights for its coffee products, is based in Massachusetts. According to Ms. Armstead's LinkedIn profile, around the time of the launch of Keurig's purportedly recyclable Pods, she was "driving business strategies" based upon a "better understanding of [Keurig's] customers." She led the "Consumer Insights team," which she describes as "the central point of truth…for [Keurig]" as it infuses consumer "understanding into [Keurig's] innovation and product portfolio."

62.     Similarly, Keurig's Senior Director of Marketing, Linsday Fermano, was located in Massachusetts.

63.     Keurig's Chief Executive Officer, Brian P. Kelley, who stated in Keurig's Sustainability Report (described above) that "[t]he lack of recycling options for used K-Cup packs stands out front and center," of ways Keurig "can do better," and pledging that "100% of K-Cup packs will be recyclable," was is based in Massachusetts.

64.     Keurig's employees responsible for Keurig's corporate strategies in connection with sustainability are also based in Massachusetts. For example, Keurig's Chief Sustainability Officer from 2014 to present (and Director of Sustainability for years before that), Monique Oxender, is based in Massachusetts. She describes herself as having been responsible for "brand

16

enhancement through pro-active identification of sustainability issues…coupled with actionable and measurable strategies for implementation." Ms. Oxender specifically identifies as one of her "[c]ore areas of expertise" issues of "product stewardship (incl. recyclability)" and "general management of the recyclable product platform." Ms. Oxender indicates she fulfilled these responsibilities in Massachusetts.

65.     Another Keurig employee, Kristina Bosch Ladd, who indicates she "manage[s] the company's…environmental footprints towards its 2020 sustainability targets," and "oversee[]s recovery and recycling programs," is based in Massachusetts.

66.     These examples are not cherry picked. A review of the LinkedIn profiles of the Keurig employees who appear to be most directly responsible for the deception Plaintiff alleges in this complaint reflects that almost all such employees were based in Massachusetts at the time of the wrongful conduct. That is, Keurig's senior staff responsible for marketing, consumer relations, and product design performed those functions in Massachusetts, making Massachusetts the locus of the fraudulent and deceptive conduct that Plaintiff alleges.

***The Injury and Damages from Keurig's Deception***

67.     Plaintiff and other members of the classes have been economically injured by Keurig's false and deceptive representations that the Pods are recyclable. Specifically, the value to a reasonable consumer of the product that was promised—a recyclable Pod—was materially greater than the value of the product that Keurig actually provided—a Pod that is not recyclable. That is, Plaintiff and other members of the classes received products that were substantially less valuable than the promised products, and suffered damages measurable as that difference in value.

68.     Additionally, Plaintiff and other members of the Classes paid more to obtain their coffee through the Pods than they would have paid to obtain their coffee from environmentally

friendly methods, such as traditional drip-brewed coffee, because Keurig had falsely and deceptively represented that the Pods were recyclable.

69.     Keurig's prominent representations on its product labels that the Pods are recyclable enabled Keurig to sell more Pods than they would have sold in the absence of such representations, thus enabling Keurig to obtain additional profits as a direct result of its misrepresentation, at the expense of consumers, including Plaintiff, who bought Keurig's purportedly recyclable Pods.

### Class Action Allegations

70.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 and Chapter 93A, Section 9(2) on behalf of herself and a National Class consisting of:

> All persons who have purchased single-serve plastic coffee pods in the United States that were manufactured by Keurig and labeled using the word "recycle" or a variant of the word "recycle," or that were labeled with the recyclable symbol— that is, a triangular symbol of three arrows.[1]

71.     Plaintiff also brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of herself and a Massachusetts Class consisting of:

> All persons who have purchased single-serve plastic coffee pods in Massachusetts that were manufactured by Keurig and labeled using the word "recycle" or a variant of the word "recycle," or that were labeled with the recyclable symbol—that is, a triangular symbol of three arrows.

72.     Plaintiff reserves the right to amend the definition of the Massachusetts Class and/or the National Class (together, the "Classes").

73.     This action is properly maintainable as a class action.

74.     The members of both Classes are so numerous that joinder of all members is impractical.

---

[1] The triangular recycle symbol is shown following paragraphs 29 and 31 above.

75.     Common questions of law and fact exist as to all members of the Massachusetts Class and the National Class and predominate over any questions solely affecting individual members of the Classes. Among the predominant questions of law and fact common to the Classes are:

(a)     Were the Pods sold with labels that communicated that the Pods were recyclable?

(b)     Are the Pods, in fact, recyclable?

(c)     Are the Pods "recyclable" under the FTC's Green Guide?

(d)     Did Keurig's conduct alleged herein constitute deceptive acts or practices in the conduct of trade or commerce in violation of Chapter 93A, §2?

(e)     Has Keurig willfully and knowingly violated Ch. 93A, §2?

(f)     Are the members of the Classes entitled to damages?

(g)     What is proper measure of damages?

(h)     Are the members of the Classes entitled to injunctive relief, enjoining Keurig from continuing to represent on the Pod labels that the Pods are recyclable?

76.     Plaintiff's claims are typical of the claims of the members of both Classes because, like Plaintiff, each member purchased Pods that were deceptively labeled as being recyclable.

77.     Plaintiff will fairly and adequately protect the interests of the members of the Classes and has retained counsel who have extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Classes.

78.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Furthermore, the damage that has been suffered by any individual Class member is nor likely to be substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all members of the Classes to redress the wrongs

done to them individually. There will be no difficulty in the management of this action as a class action.

79.     The identity of many members of the Classes can be determined through Keurig's and other companies' records, and Plaintiff is a member of the Classes.

80.     Keurig has acted on grounds generally applicable to the Classes with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Classes as a whole.

## **COUNT I**

(Violation of Chapter 93A, Section 2, on behalf of the National Class
and the Massachusetts Class)

81.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

82.     At all relevant times, Keurig was engaged in trade or commerce within the Commonwealth of Massachusetts, including the trade or commerce of selling, or causing to be sold, the Pods at issue from the Commonwealth of Massachusetts.

83.     By conducting the unfair and deceptive labeling of its Pods as recyclable, as described above, Keurig has engaged in unfair or deceptive acts or practices in the conduct of trade or commerce in violation of Chapter 93A, Section 2.

84.     Moreover, by engaging in the conduct described above, Keurig violated at least the following General Regulations of the Massachusetts Attorney General regarding Ch. 93A:

(a)     940 C.M.R. 3.02(2), which states:

No statement or illustration shall be used in any advertisement which creates a false impression of the grade, quality, make, value, currency of model, size, color, usability, or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised product to another.

(b)     940 C.M.R. 3.05(1), which states:

No claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect. This prohibition includes, but is not limited to, representations or claims relating to the construction, durability, reliability, manner or time of performance, safety, strength, condition, or life expectancy of such product, or financing relating to such product, or the utility of such product or any part thereof, or the ease with which such product may be operated, repaired, or maintained or the benefit to be derived from the use thereof.

(c)     940 C.M.R. 3.16(1)-(2), which provides that:

Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction . . . .violates Chapter 93A, §2.

(d)     940 C.M.R. 6.03(2), which states:

Sellers shall not use advertisements which are untrue, misleading, deceptive, fraudulent, falsely disparaging of competitors, or insincere offers to sell.

(e)     940 C.M.R. 6.04(1)-(2), which state:

(1) Misleading Representations. It is an unfair or deceptive act for a seller to make any material representation of fact in an advertisement if the seller knows or should know that the material representation is false or misleading or has the tendency or capacity to be misleading, or if the seller does not have sufficient information upon which a reasonable belief in the truth of the material representation could be based.

(2) Disclosure of Material Representations. It is an unfair or deceptive act for a seller to fail to clearly and conspicuously disclose in any advertisement any material representation, the omission of which would have the tendency or capacity to mislead reasonable buyers or prospective buyers. . . .

85.     Keurig's violation of the regulations enumerated above constitute violations of Chapter 93A, Section 2(a) because regulations promulgated by the Massachusetts Attorney General under Chapter 93A, Section 2(c) provide that any act or practice that "fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection…" 940 C.M.R. 3.16(3), violates Chapter 93A, Section 2.

86.     Furthermore, as previously noted, the FTC's interpretations of the FTC Act, including those set forth in the Green Guides, are instructive and controlling as to whether Keurig's labels on its Pods are deceptive in violation of Chapter 93A, §2. *See* M.G.L. c. 93A § 2(b) ("It is the intent of the legislature that in construing [the meaning of "deceptive acts or practices"]…courts will be guided by the interpretations given by the Federal Trade Commission …to section 5(a)(1) of the Federal Trade Commission Act….")

87.     Accordingly, because Keurig's labeling of the Pods violated the FTC Green Guides and hence Section 5 of the FTC Act, that labeling also constitutes false and deceptive acts and practices in violation of M.G.L. c. 93A § 2(b).

88.     The violations of Chapter 93A by Keurig as described herein were done willfully, knowingly, and in bad faith.

89.     As a direct and proximate result of Keurig's conduct, Plaintiff and the members of the Classes were harmed by purchasing a product (Pods that were not recyclable) that was less valuable than the product that was promised to them (Pods that were recyclable). Keurig's conduct also caused consumers to pay more for their coffee than they would have had Keurig not made its false and deceptive misrepresentations. They were also harmed by purchasing a product that they would not have purchased but for the misrepresentations.

90.     On or around June 18, 2020, Plaintiff sent Keurig written demand for relief pursuant to Chapter 93A, Section 9, identifying the claimant and reasonably describing the unfair acts or practices relied upon and the injuries suffered. Keurig responded on July 30, 2020. In that response Keurig did not make a reasonable offer of relief for the unfair and deceptive acts Plaintiff described in his demand letter. In fact, Keurig, in its response letter refused to make any offer of relief.

91.     As a result of Keurig's violation of Chapter 93A, § 2, Keurig is liable to Plaintiff and the Classes for the damages that Plaintiff and the Classes incurred, or the statutory minimum award of $25 per purchase of a Pod, whichever is greater.

92.     As a result of Keurig's willful and knowing violation of Chapter 93A, §2, Keurig is liable to Plaintiff and the Classes for up to three time the damages that Plaintiff and the Classes incurred or the statutory minimum award of $25 per purchase of a Pod, whichever is greater.

93.     As a result of Keurig's failure to make a reasonable offer a settlement in response to Plaintiff's written pre-suit demand for relief, Keurig is liable to Plaintiff and the Classes for up to three time the damages that Plaintiff and the Classes incurred or the statutory minimum award of $25 per purchase of a Pod, whichever is greater.

94.     Keurig is also liable to the Plaintiff for all related court costs, attorneys' fees, and interest.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.     Allowing this action to proceed as a class action under Federal Rule of Civil Procedure 23 and Chapter 93A, Section 9(2);

2.     Determining and awarding Plaintiff and members of the Classes monetary damages;

3.     Awarding Plaintiff and members of the Classes up to three times their damages, or in the alternative statutory damages, whichever is greater, together with interest and costs;

4.     Declaring that Keurig's labeling of the Pods is false and deceptive, and therefore violates Chapter 93A, Section 2;

5.      Issuing preliminary and permanent injunctions, enjoining the Defendant Keurig from representing in any way on the labels of its Pods (or in any other public statements by Keurig) that the Keurig Pods are recyclable;

6.      Awarding counsel for the Plaintiff and the Classes their reasonable attorneys' fees and expenses; and

7.      Awarding such other and further relief which the Court finds just and proper.


**<u>Jury Demand</u>**

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 9, 2020                    By his attorneys,


                                            */s/ Edward F. Haber*
                                            Edward F. Haber (BBO #215620)
                                            Ian J. McLoughlin (BBO #647203)
                                            Patrick J. Vallely (BBO #663866)
                                            SHAPIRO HABER & URMY LLP
                                            2 Seaport Lane
                                            Boston, MA 02210
                                            Telephone: (617) 439-3939
                                            Facsimile: (617) 439-0134
                                            ehaber@shulaw.com
                                            imcloughlin@shulaw.com
                                            pvallely@shulaw.com